

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* DON KENNARD, et. al, | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 9:98-CV-266-TH |
| | § | BENCH |
| | § | |
| COMSTOCK RESOURCES, INC., et. al., | § | |
| | § | |
| *Defendants.* | § | |

# <u>MEMORANDUM OPINION and ORDER</u>

Before the Court are *Relators' Motion for Partial Summary Judgment that Defendants are Trespassers on the Reservation* [Clerk's Docket No. 251]; *Defendants' Response to Relators' Motion for Partial Summary Judgment and Cross-Motion for Complete Summary Judgment* [Clerk's Docket No. 253]; *Relators' Response to Defendants' Cross Motion for Complete Summary Judgment and Reply in Support of Relators' Motion for Partial Summary Judgment* [Clerk's Docket No. 258]; *Defendants' Sur-Reply to Relators' Reply in Support of Relators' Motion for Partial Summary Judgment and Reply in Support of Defendants' Motion for Complete Summary Judgment* [Clerk's Docket No. 265]. The Court held a hearing on the motions and responsive pleadings on July 14, 2010. Having considered the briefing, oral arguments of counsel, and all relevant papers and pleadings, the Court finds that Defendants' motion for complete summary judgment should be **GRANTED**.

**Introduction**

This is a *qui tam* case brought by Relators on behalf of the United States Government against Defendants Comstock Resources, Inc. and Comstock Oil & Gas, Inc. (Defendants or "Comstock") under the False Claims Act (the FCA), 31 U.S.C. § 3729, *et seq*. The case centers around oil and gas leases issued by the State of Texas while it was a trustee for the Alabama and Coushatta Indian Tribes of Texas (the "Tribe") to Comstock's predecessors in title, and later federal Mineral Agreements[1] approved by the federal government after it became trustee for the Tribe. Comstock pays royalties under the leases to the Minerals Management Services, an agency of the United States Department of the Interior, which remits such royalties to the Tribe. Relators allege that Comstock knowingly submitted false MMS-2014s reports with the Minerals Management Service of the Department of the Interior. *See* Rel. First Am. Comp. (Doc. No. 191). A Form MMS-2014s is "[u]sed monthly to report lease-related transactions essential for royalty management to determine the correct royalty amount due, reconcile or audit data, and distribute data to appropriate accounts." 30 C.F.R. § 210.10(c)(1) (2005). The MMS-2014 requires the operator to identify a particular MMS Lease (by Accounting Identification Number ("AID")), the royalty percentage associated with that lease, the total sales volume and value for the month, and the royalty volume and value for the month under the lease. *See* Defs. Mot. Summ. J., Tanner Dep., Ex. 2 (sample Form MMS-2014). The form does not require the operator to provide any affirmative statement on the validity of the underlying lease. Relators argue that the alleged invalidity of the underlying leases entitled the United States (the "Government"), as trustee for the Tribe, to one hundred percent of the royalties and that the

_____

[1] As that term is defined in section 2102 of the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2102-2108.

MMS-2014s were therefore false statements under the federal False Claims Act.[2]

## **Factual Background**

Comstock's rights to conduct operations on the Tribal Lands derive from seven leases originally issued by the State of Texas General Land Office ("GLO")and two Minerals Agreements issued by the United States Department of the Interior ("DOI") (collectively the "Leases") . Comstock is the successor-in-interest to the rights of Black Stone Oil Company ("BSOC"). There are eleven tracts of Reservation land covered in the Leases, referred to as Tract Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11.

Tract 1

Comstock conducts its operations on Tract 1 under a Minerals Agreement dated May 25, 1993 (the "1993 Minerals Agreement"). Section 24 of the 1993 Minerals Agreement contains a "no surface use" provision. This provision states that "the Lessee [Comstock] shall not conduct drilling operations or otherwise use the surface of the lands covered by this lease for any operations of any kind or nature." Rels. Mot. Summ. J. Ex. 23 (The 1993 Minerals Agreement) at 19 (Doc. No. 251). Despite this provision, two wells, Well No. 6 and Well No. 7, were drilled on the surface of Tract 1. In May of 1995, the Alabama Coushatta Indian Tribal Counsel ("ACITC") adopted Resolution

---

[2] Relators have stipulated they will not pursue false claims submitted prior to October 27, 1992 due to the six-year limitation period of 31 U.S.C. § 3731(b)(1). *See also United States ex rel. Foster v. Bristol-Myers Squibb Company*, 587 F. Supp. 2d 805, 816 (E.D. 2008). Relators have further stipulated that they do not challenge Comstock's operations after January 4, 2006 because of the preclusive effect of the 2006 Settlement Agreement. Rels. Resp. 36 (Doc. No. 258).

95-14, which approved BSOC's request to obtain a permit from the Bureau of Land Management ("BLM") to conduct an environmental and archaeological assessment and drilling operations on Tract 1. Defs. Mot. Summ. J., Powers Aff. Ex K; Tribe Aff. Ex. F (Doc. No. 253). A month later, BSOC advised the BLM and Bureau of Indian Affairs ("BIA") of BSOC's intent to drill Well No. 6 on the surface of Tract 1 and the Tribe's approval of BSOC's plans to use a specific site and surface construction plan for the well. Powers Aff. Ex. M.[3] On or about June 21, 1995, BSOC's environmental consultant Bob McFarlane sent his Environmental Assessment to the BLM. Defs. Mot. Summ. J., Beatty Aff. Exs. O and P (Doc. No. 253). On or about July 13, 1995, ACITC adopted Resolution 95-23 by which the Tribe granted permission to BSOC to drill Well No. 6 and approved surface damage and bonus payments from BSOC to the Tribe in the amount of $100,000. Concurrent with ACITC's approval, the BLM also granted BSOC a permit to drill Well No. 6 on Tract 1. Powers Aff., Ex. O. In November of 1995, ACITC adopted Resolution 95-41, which approved BSOC's request for a pipeline right-of-way across Tract 1 for Well No. 6. Powers Aff., Ex. P; Tribe Aff. Ex. H. In January of 1996, BIA granted BSOC an easement and right of way for a pipeline on Tract 1 for Well No. 6. Defs. Mot. Summ. J., Powers Aff., Ex. Q.

Next, BSOC approached the Tribe about Well No. 7. In January of 1996, ACITC adopted Resolution 96-08, approving BSOC's request to obtain a permit from BLM to conduct an environmental and archaeological assessment, to be followed by drilling and pipeline connections for Well No. 7 within Tracts 1, 2, 6, and 7, and acknowledging that the surface location for Well No. 7 would be within Tract 1. Defs. Mot. Summ. J., Powers Aff. Ex. R; Tribe Add. Ex. I. The ultimate

---

[3] For clarity, BLM and BIA are federal bureaus.

approval process for Well No. 7 tracked that of Well No. 6.  Defs. Mot. Summ. J. 16 -18.

Tracts 2, 3, and 4

Relators claim that the State of Texas leases governing Tracts 2, 3, and 4 expired on April 1, 1989 and that all MMS-2014s filed after that date should have reflected Defendants were now trespassers, passing 100% of the royalties to the Government as trustee for the Tribe.  Rel. First Am. Comp. 4 (Doc. No. 191).  The state leases were Lease No. 92009 (covering Tract 2), Lease No. 92010 (Tract 3), and Lease No. 92011 (Tract 4).  Each lease had a primary term set to expire on April 1, 1989.  In March of 1989, the Department of the Interior (DOI) acknowledged the validity of the state leases.  Defs. Mot. Summ. J., Letter from DOI to BSOC, dated March 10, 1989, Powers Aff. Ex. B (Doc. No. 253).  In January of 1988, BSOC requested the Tribe approve additional time for development of the leases.  The Tribe forwarded that proposal to the BIA which, in turn, forwarded the request to BLM for evaluation.  Defs. Mot. Summ. J. 18.  In January of 1989, the BLM recommended approval of that agreement in return for monetary compensation to the Tribe and BSOC simultaneously submitted an application to drill Well No. 2, which the BLM reviewed and approved in March of that year.  *Id.*  On March 3, 1989, BSOC and the Tribe entered into a Communitization Agreement that provided for the communitization and development of Leases 92009, 920119, and 92011.  The BIA approved the Communitization Agreement on March 17, 1989.  Defs. Mot. Summ. J. 19.  The Communitization Agreement combined Tract 3 and 4 and a part of Tract 2.  Defs. Mot. Summ. J., Tribe Aff. Ex. B (Communitization Agreement) 1 (Doc. No. 253).  The Communitization Agreement was to be effective March 1, 1989, and to remain in force and effect for a period of one year, or during the primary term of the restricted Indian leases, whichever

is the lesser, and so long thereafter as any communitized substance [oil and gas] is produced from any part of said communitized area in paying quantities." *Id.* at 4. On March 28, 1989, BSOC and the Tribe entered into a Lease Extension Agreement which extended the primary terms of the restricted leases until July 30, 1989. BSOC paid $36,000 for the extension. The BIA approved the extension on March 31, 1989, the day before the leases were set to expire. *Id.* Well No. 2 was drilled on the surface of Tract 3 in a unit that was made up of all of Tract 2, all of Tract 3, and part of Tract 4. *Id.* Well No. 2 began producing on July 30, 1989 and has produced continuously since then. *Id.*


Tracts 7, 8, 9, and 10

The State of Texas issued leases governing Tracts 7 (Lease No. 80579), 8 (Lease No. 82043), 9 (Lease No. 80580), and 10 (Lease No. 82044). Each of these original leases was for a three year period "and as long as oil and gas, or either of them, is produced from said land in paying quantities." Rel. First Am. Comp. 20 (Doc. No. 191). On October 19, 1982, just before the first of these state leases was set to expire, the GLO executed a "Unit Pooling Agreement and Designation, Alabama Coushatta Unit No. 1 Polk County, Texas" (the "Pooling Agreement"). The Polling Agreement describes Tracts 7, 8, 9, and 10 of the Reservation and BSOC's respective state leases for those tracts. Defs. Mot. Summ. J. 22 (Doc. No. 253). The Pooling Agreement pooled the separate tracts of land governed by various mineral leases into one unit: Unit 1. The Pooling Agreement states that "[a]ll drilling operations, reworking or other operations with respect to the pooled mineral [oil and gas] on land within the unit shall be considered as though the same were on each separate tract in the unit, regardless of the actual location of the well, or wells thereon, for all

purposes under the terms of the respective leases or other contracts thereon and this Agreement." Defs. Mot. Summ. J., Beatty Aff. Ex. L 2 (The Pooling Agreement) (Doc. No. 253). It further states that "[s]hould this Agreement terminate for any cause, in whole or in part, the leases and other contracts affecting the lands within the unit shall remain and may be maintained in force and effect under the respective terms and conditions in the same manner as though there has been production or operations under said lease or contract and the same had ceased on the date of termination of this Agreement." *Id.* at 3. On April 4, 1983, the Commissioner of the GLO forfeited the leases Tracts 7 and 9 for non-payment of rentals as of that date. The next day, the Commissioner reinstated the leases and all rights thereunder, which the GLO confirmed in a letter dated April 13, 1983. Defs. Mot. Summ. J. 22 (Doc. No. 253). In 1987, the GLO amended the Pooling Agreement, again describing each of the state leases for Tracts 7, 8, 9, and 10 and amending those leases. *Id.* at 23. In 1989 both the GLO and the Tribe acknowledged the validity and good standing of these same leases. *Id.* The GLO issued a report on oil and gas leases and easements affecting the Tribe which stated the leases were in effect and held by production from Unit 1. The Tribe adopted Resolution 89-49, by which the Tribe ratified and confirmed the validity and good standing of the leases. *Id.* Finally, the Tribe and BSOC executed a "Ratification of Oil, Gas and Mineral Leases" in which the Tribe did "adopt, ratify and confirm" the underlying state leases and the Pooling Agreement. The Ratification specifically recognized that the leases were in full force and effect. *Id.* Also in 1989, the BIA confirmed the validity of the leases and the Pooling Agreement. *Id.* at 24.


Tract 5

On April 1, 1986, the GLO issued an oil and gas lease covering Tract 5 of the Reservation

(Lease No. 92012).  The lease expired three years from that date, in the absence of any production of oil or gas from the area.  Rels. First Am. Comp. 46 (Doc. No. 191).  On April 1, 1989, there was still no producing well on Tract 5.  *Id.*  Relators assert that the state lease to Tract 5 expired on April 1, 1989 for lack of production.  *Id.*

1990 Minerals Agreement

Comstock conducts operations on the Reservation under a Minerals Agreement dated July 23, 1990 (the "1990 Minerals Agreement"), which covers part of Tract 2, and all of Tracts 5, 6, and 11.  Defs. Mot. Summ. J. 20 (Doc. No. 253).  Relators did not challenge the 1990 Minerals Agreement in their First Amended Complaint with regard to Tracts 5, 6, or 11, instead arguing that the 1986 state leases covering Tracts 2 and 5 expired by their own terms in 1989.  Rels. First Am. Comp. 16 and 46 (Doc. No. 258).  Tracts 6 and 11 are not referenced.  The only mention of the 1990 Minerals Agreement is within paragraph 280, where Relators note that Tract 2 was also described in a federal Minerals Agreement dated July 23, 1990, which they assert expired in 1993 for non-development during the prescribed period.  Rels. First Am. Comp. (Doc. No. 191).  In response to Defendants raising the 1990 Minerals Agreement as a defense to the allegations contained in Relators' First Amended Complaint as to Tracts 2 and 5, Relators now contend that the 1990 Minerals Agreement is invalid because it was executed without the proper steps under federal law.[4] Because Tracts 6 and 11 are covered by the 1990 Minerals Agreement, they are referenced in the

---

[4] "In defense of Relators' claims that the State Leases on Tracts 2, 5 and 6 terminated, Defendants have come forward with their 1990 federal Minerals Agreement. . . ."  Rels. Mot Part. Summ. J. 21 (Doc. No. 251).  Although Relators include Tract 6 in this statement, the Court has found no reference to Tract 6 in their first amended complaint.

parties' briefing on the subject. The Court notes, however, that Tract 6 and Tract 11 are not mentioned in Relators' first amended complaint nor did Relators' challenge Comstock's right to conduct operations on these except in their response to Comstock's assertion of the 1990 Minerals Agreement.[5] Relators are the original source only for the alleged invalidity of the State of Texas leases covering Tracts 2, 3, 4, 5, 7, 8, 9, and 10 and the 1993 Minerals Agreement. *See* Court Order February 20, 2009 (Doc. No. 192); *see also* Rels. First Am. Comp. (Doc. No. 191). Therefore, the 1990 Minerals Agreement validity is only before this Court as a defense to Relators' assertions regarding Comstock's allegedly invalid rights to conduct operations on Tracts 2 and 5 under expired state leases.

## **Procedural Background**

This action originated with relator Harold E. "Gene" Wright ("Wright"), who owned royalty interests in a tract of land in East Texas near the Tribe's Reservation. Wright received royalty payments for gas wells on this property for more than twenty-five years. During this time, the operator on Wright's property sold its lease interests to Comstock; and Wright's royalty payments dropped dramatically. Based on this dramatic drop, and Wright's extensive experience in the oil and gas industry, Wright speculated that Comstock was underpaying him and others in the area–including the Tribe.

Wright contacted Relator Don Kennard ("Kennard") with this information. Kennard then

---

[5] The Supreme Court has decided that the relevant allegations for determining a relator's original source status under the FCA are those contained in the original complaint as amended. *See Rockwell Int'l Corp. v. United States ex rel. Stone*, 549 U.S. 457 (2007).

researched and investigated public records at the Texas Railroad Commission and the Texas General Land Office and discovered that the Indian Leases might have expired. Based on this investigation and their extensive oil and gas experience, Relators concluded that (1) Comstock was underpaying royalties to the Tribe, and (2) Comstock knew that it was underpaying the Tribe.

Relators discussed their conclusions with several attorneys and determined that Comstock had violated the FCA by submitting fraudulently undervalued royalty payments to the MMS. Relators' attorneys, including Michael Sydow ("Sydow"), began drafting a complaint detailing these allegations.

However, in what Relators say was a surprise move, Sydow then filed suit acting as the Tribe's attorney instead of Relators' attorney. Relators claim that Sydow was a "renegade" who essentially stole their information in preparing the Tribe's complaint. *See* Rels. Resp. to Def.s' Mot. for Summ. J. on Jurisdiction 6 (Doc. No. 87). The next day, Relators filed this lawsuit alleging basically the same things contained in the Tribe's complaint.

Shortly thereafter, the Tribe dropped their *qui tam* case and instead filed suit against Comstock in the tribal court of the Alabama and Coushatta Nation. There, the Tribe sought to have the Indian leases declared null and void because of deficiencies in execution, or because they had not been properly approved by the Secretary of the Interior.

In response to these developments, Comstock went on the offensive, filing a lawsuit of its

own on February 9, 1999, in the United States District Court for the Eastern District of Texas, Lufkin Division (the "Declaratory Action"). This Declaratory Action was placed on the docket of the Honorable Paul Brown.[6] In the suit, Comstock sought declaratory judgment *inter alia*: (1) that the Indian Leases were valid and in full effect; and (2) that Comstock had performed all of its obligations under the Indian Leases, including payment of all royalties. The Tribe and the Department of the Interior were named as defendants in the Declaratory Action. And, the Department of the Interior was represented in the suit by the United States Department of Justice.

After several years of litigation—and a trip to the United States Court of Appeals for the Fifth Circuit—the parties to the Declaratory Action formally resolved their dispute by executing a "Compromise and Settlement Agreement" on January 4, 2006. Specifically, Comstock, the Tribe and the United States (by and through the Secretary of the Interior) entered into this settlement agreement. The parties explicitly stipulated that each of the Indian Leases "is, and always has been, valid and in full force and effect, and binding upon the Tribe." Def.s' Mot. for Complete Summ. J. on the Merits, Ex. N at 4 (Doc. No. 73). The Department of the Interior agreed to dismiss all prior demands for royalty payments made to Comstock. *Id.* And, the Tribe released Comstock from any and all claims "arising out of or relating to the Leases or the Wells, or the royalty proceeds attributable to the Leases" including claims that could have been asserted in the Declaratory Action.

_____

[6] The Declaratory Action was originally assigned case number 9:99-CV-31 in the Lufkin Division. On December 28, 1999, Judge Brown transferred the case to the Sherman Division, where it was given case number 4:99-CV-312. The Declaratory Action produced two published opinions: *Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes of Tex.*, 78 F. Supp. 2d 589 (E.D. Tex. 1999); and *Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes of Tex.*, 261 F.3d 567 (5th Cir. 2001).

*Id.* at 13.

The parties to the Declaratory Action then filed a "Joint Stipulation of Dismissal With Prejudice" on January 23, 2006. *Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes of Tex.*, No. 4:99-CV-312 (E.D. Tex. filed Jan. 23, 2006). In this filing, the parties stipulated to the dismissal (with prejudice) "of all claims and causes of action that have been asserted or that could have been asserted in [the Declaratory Action]," in accordance with Rule 41(a)(1)(ii) of the FEDERAL RULES OF CIVIL PROCEDURE. *Id.* Judge Brown reviewed the stipulation of dismissal and entered a "Final Order of Dismissal With Prejudice." *Comstock Oil & Gas, Inc. v. Alabama and Coushatta Indian Tribes of Tex.*, No. 4:99-CV-312 (E.D. Tex. filed Jan. 25, 2006).

Meanwhile, Relators' suit has lived longer and traveled further than anyone could have expected at the time of their initial filing. From 1998 to 2001 the case was assigned to three different district judges in the Eastern District of Texas.[7] It was then transferred by the Judicial Panel on Multidistrict Litigation (the "MDL Panel") to the District of Wyoming for inclusion in centralized pretrial proceedings before the Honorable William F. Downes in the case of *In re Natural Gas Royalties Qui Tam Litigation*. Over the next six years, the case traveled up and down the federal court system before it was remanded to this Court in December 2007.[8]

---

[7] The case was originally assigned to the Honorable John Hannah, Jr. However, Judge Hannah subsequently recused himself on May 19, 2000 due to the fact that the Alabama-Coushatta had given him an honorary lifetime membership in the Tribe. The case was briefly assigned to the Honorable Richard A. Schell; then to the Honorable Paul Brown.

[8] While the case was part of the MDL in Wyoming, Judge Paul Brown retired. So, upon remand, the case was given to the undersigned judge.

In March of 2009, this Court entered final judgment against Relators after granting Comstock's motion for summary judgment, reasoning that the 2006 Settlement Agreement of the Declaratory Action barred any further litigation of Relators' claims. On September 25, 2009, the Court vacated that order and granted Relators' motion for a new trial after an exhaustive examination of *res judicata* jurisprudence. Court Order Granting Motion for New Trial (Doc. No. 217). The case is currently stayed pending the Court's final disposition of Relators' and Defendants' pending motions for summary judgment, to which the Court now turns.

## Legal Principles

### A.     Legal Standard for Summary Judgment

In a motion for summary judgment, the moving party has the initial burden of showing that there is no genuine issue of any material fact and that judgment should be entered as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). An issue is "material" where it involves a fact that might affect the outcome of the suit under the governing law of the underlying cause of action. *See Burgos v. S.W. Bell Tel. Co.,* 20 F.3d 633, 635 (5th Cir. 1994) (citing *Liberty Lobby,* 477 U.S. at 248)). The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley,* 992 F.2d 540 (5th Cir. 1993). Once the motion is "properly made and supported," however, the opposing party has an "obligation to respond" and to, via affidavits or other means, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "Summary judgment will

not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. Here, the facts upon which the parties rely are predominantly settled while the legal effect of the various agreements formed and wells drilled is very much in dispute.

**B.    The False Claims Act**

<u>History</u>

In 1863, Congress enacted the False Claims Act (the FCA), 31 U.S.C § 3729, *et seq.*, or "Lincoln's Law,"in response to serious allegations of fraud upon the government during the Civil War, including the reported selling of bullets containing sawdust instead of gunpowder, unseaworthy ships provided to the Navy, and supplies sold to units of the Union cavalry and then resold to other units. *See United States v. Bornstein*, 423 U.S. 303, 309 (1976) (the False Claims Act was enacted in 1863 with the goal of "stopping the massive frauds perpetrated by large [private] contractors during the Civil War.") The act contains a *qui tam*,[9] or "whistleblower," provision which allows private individuals to bring a civil suit on behalf of the United States against persons who defraud the government. This provision was viewed as essential given the absence of federal agencies, such as a centralized Department of Justice, to enforce the act and the paucity of financial resources available in the midst of the ongoing civil war. *See* Helmer, Lugbill and Neff, FALSE CLAIMS ACT: WHISTLEBLOWER LITIGATION §3-3, at 27 (1994); *see also United States v. Griswold*, 24 F. 361 (C.C.D. Or. 1885) ("It [the False Claims Act] was passed upon the theory, based on experience as

---

[9] The term "*qui tam*" is an abbreviation for the Latin phrase "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*;" which means "he who sues on behalf of the king as well as for himself in this matter." Black's Law Dictionary (9th ed. 2009).

old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury was to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gains.")

Post Civil War, the FCA *qui tam* power was rarely invoked until the 1930s and 40s, when the onslaught of federal spending led to increased opportunities for fraud against the federal government. *See United States ex. Rel. Findley v. FPC-Boron Employees' Club*, 105 F. 3d 675, 679 (D.C. Cir. 1997). *Qui tam* litigation surged. The loose jurisdictional requirements of the original False Claims Act meant that opportunistic plaintiffs might simply copy a fraud complaint directly from the government's criminal fraud indictment against the same defendant and proceed. *See United States ex. Rel. Marcus v. Hess*, 317 U.S. 537 (1943). In 1943, Congress curtailed such activities by prohibiting *qui tam* actions "based on evidence or information in the possession of the United States . . . at the time the suit was brought." Act of December 23, 1943, 57 Stat. 608, recodified in 31 U.S.C. § 3730(b)(4) (superseded). Unfortunately, this prohibition was found to be overly severe as it discouraged whistleblowers from submitting their evidence of fraud to the government for fear of losing their ability to proceed under the statute. *United States ex rel. Lamers v. City of Green Bay*, 168 F. 3d 1013, 1016 (7th Cir. 1999) (discussing the history of *qui tam* legislation).

A balance was struck in 1986, when the FCA was substantially amended and strengthened due to rising government fraud, especially in the areas of defense contracting and health care

benefits. S. Rep. No. 345, 99th Cong., 2d Sess. 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5267-69. The new statute was meant to achieve the "golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute on their own." *United States ex rel. Springfield Ry. Co. v. Quinn*, 304 U.S. App. D.C. 347 (D.C. Cir. 1994). Under the current FCA, private citizens may proceed under the *qui tam* provision of the FCA only if they have independently gained knowledge of fraud. 31 U.S.C. § 3730(e)(4).[10] Here, Relators' are the original source of the information against Comstock because they "sorted through relatively obscure public documents and, together with personal royalty records, used these documents to discover and support their claim of the alleged fraud. . . . Through discovery and deduction Relators ferreted out the alleged fraud in this case and must, therefore, qualify as an original source." *Kennard v. Comstock Resources, Inc.*, 363 F. 3d 1039 (10th Cir. 2004); *see also*, Court Mem. Op. and Order, February 20, 2009 (Doc. No. 192) (holding that the Tenth Circuit's holding in *Kennard* is the law of the case and refusing to grant summary judgment to Defendant's under a theory that Relators were not the original source of the information).

**Current Requirements under the FCA**

In *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F. 3d 458 (5th Cir. 2009), the Fifth Circuit adopted the following test from the Fourth Circuit, which it found concisely stated the various requirements for liability to attach under the FCA: "(1) whether there was a false

---

[10] Almost as lengthy as the historical development of *qui tam* legislation is the procedural history of this convoluted case.

statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *Longhi*, 575 F. 3d at 467 (citing *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F. 3d 370, 376 (4th Cir. 2008)).

## Analysis

Relators have not met their burden under the FCA. First, they have failed to show that Defendants made false statements to the Government when they filed their MMS reports. The Leases were valid because the Government and the Tribe extended and ratified the necessary state leases and enacted valid federal Minerals Agreements. Second, Relators have offered no evidence that Defendants had the requisite *mens rea* under the FCA. Having found Relators have failed to raise a question of fact on either of these two issues, the Court need not go further in its analysis. Defendants' motion for complete summary judgment shall be granted.

## A.     Defendants are not trespassers because the Leases are valid.

Defendants move for summary judgment on Relators' claims relating to Tracts 1, 2, 3, 4, 5, 7, 8, 9 and 10 of the tribal lands because the Government expressly approved the operations Relators challenge. The United States approved the surface locations for the operations on Tract 1; the extension of the State of Texas leases on Tracts 2, 3, and 4; and the ratification of the State of Texas leases on Tracts 7, 8, 9, and 10. Relators respond by attacking the Government's actions as insufficient under various federal laws. *See* Rels. Mot. Part. Summ. J. 17-22 (Doc. No. 251).

Relators further argue that the State of Texas retained leasing authority over the Reservation until it conveyed the Reservation to the federal government on August 1, 1989. Thus, federal action could not extend the lease for Tract 3, which expired in April of 1989 under its original terms. After careful consideration, the Court finds Relators' arguments unpersuasive.

**Federal Leasing**

(1)  Leasing Without Title

Relators argue that the State of Texas retained leasing jurisdiction over the Reservation until it conveyed the Reservation to the federal government on August 1, 1989. The lease issued by the GLO to BSOC for Tract 3 expired in April of 1989 under its original terms, however, the federal government approved an agreement between BSOC and the Tribe to extend the lease just prior to its expiration. Relators contend that extension was invalid as the federal government did not yet have leasing authority over the tribal lands. Both sides agree that the federal government had exclusive leasing authority over the Reservation after August 1, 1989.

Comstock argues that pursuant to the 1987 "Ysleta del Sur Pueblo and Alabama Coushatta Indian Tribes of Texas Restoration Act" (the "Restoration Act"), the federal government took trusteeship of the Tribal Lands, including leasing authority, away from the State of Texas, even though the State of Texas retained title to the lands until 1989. Defs. Mot. Summ. J. 43 (Doc. No. 253). Relators argue that even after the Restoration Act, the federal government could not control leasing before it acquired title. Rels. Mot. Summ. J. 24 (Doc. No. 251).

The Restoration Act provided that "[t]he reservation is hereby declared to be a Federal Indian reservation for the use and benefit of the tribe without regard to whether legal title to such lands is held in trust by the Secretary" (25 U.S.C. § 736(a)), and the "reservation" included "natural resources" (25 U.S.C. § 731(3)(B)). The Restoration Act restored the Tribe to federal trust status immediately upon its effective date: August 17, 1987. Section 736(a) "establishes the reservation as being under the trust supervision of the Secretary of the Interior, without regard to whether a formal conveyance of the property to the United States has been delivered." Defs. Mot. Summ. J. 43 (quoting 25 U.S.C. § 736(a): "[t]he reservation is hereby declared to be a Federal Indian reservation for the use and benefit of the Tribe without regard to whether legal title to such lands is held in trust by the Secretary."). Comstock further argues that "the U.S. Supreme Court expressly recognized that the question of whether the federal government has legal authority to regulate Indian lands is a different issue than the question of whether the United States held bare legal title to such lands." *Id.* (citing *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 670 (1974)). On the other hand, Relators' motion for partial summary judgment emphasizes various provisions of the Restoration Act that signal a Congressional intent to allow the State of Texas to continue to exercise leasing jurisdiction over the Reservation until it conveyed the Reservation to the Federal government: (1) § 736(e) authorizing the Secretary to make various types of improvements – but no leases of any kind – "without regard to whether legal title to such lands has been conveyed to the Secretary by the State"; (2) § 734(b) stating that the Secretary "shall accept any offer from the State to convey title to any lands held in trust by the State or the Texas Indian Commission for the benefit of the tribe and hold such title, upon conveyance by the tribe, in trust for the benefit of the tribe." Rels. Mot. Part. Summ. J. 24 (Doc. No. 251).

Although *Oneida* does not address the precise question at bar, *Oneida* discussed at length the

principle that "the whole power of regulating the intercourse with [Native Americans], was vested

in the United States." 414 U.S. at 671 (quoting *Worcester v. Georgia*, 6 Pet. 515, 8 L. Ed. 483

(1832)). The *Oneida* court also quoted New York state authority holding that federal leasing authority

is supreme: "As respects their lands, subject only to the pre-emptive title, the Indians are treated as

wards of the United States, and it is only pursuant to the Federal authority that their lands can be

granted or demised by or acquired by conveyance or *leased* from them." *Id.* at 674 n.8 (quoting

*Buffalo, R & P.R. Co. v. Lavery*, 75 Hun. 396, 399-400, 27 N.Y.S. 443, 445 (5th Dept., App. Div.

1894) (emphasis added)). *Oneida* further noted another state authority that addressed lack of fee title:

> Relying on the classic federal cases, the [New York Court of Appeals] held that
> federal power was pre-eminent and that the Federal Government had made treaties
> with the Indians which confirmed their territorial possession, although the Federal
> Government *never owned the fee of the land* within the State's confines.

*Id.* (quoting *People ex rel. Cusik v. Daly*, 212 N.Y. 183, 192 (1914) (emphasis added)). In broadly

characterizing the federal power, the *Oneida* court noted "[w]ithin the reservation[,] federal power,

when exercised, foreclosed the exercise of power by the State," and the Court quoted state authority

holding that "when Congress does act the power of the state must yield to the paramount authority

of the federal government." *Id.* (quoting *Cusik*, 212 N.Y. at 196-97).


On balance, in light of *Oneida*, the Restoration Act gave immediate leasing authority over the

Tribal Lands to the Government, regardless of title. *See also Alabama-Coushatta Indian Tribe of Tex.

v. Mattox*, 650 F.Supp. 282, 287 (W.D. Tex. 1986) ("While fee title to Indian lands may well reside

in a state, the federal government nevertheless possesses trust responsibility to that land.") (citing *Oneida*, 414 U.S. at 667). Therefore, Relators argument that the federal government lacked the ability to approve the lease extension fails as a matter of law.

### (2) Alleged Non-Compliance with Federal Statutes and Regulations

Comstock has put forth significant evidence that the Tribe extended and ratified the state leases for Tracts 2, 3, 4, 5, 7, 8, 9, and 10 after the effective date of the Restoration Act and that the federal government approved those actions pursuant to its trust authority under the Restoration Act. *See* Defs. Mot. Summ. J. 5-17 (Doc. No. 253). Comstock has also put forth significant evidence that the Tribe approved the drilling of Well No. 6 and Well No. 7 on Tract 1 and the concurrent modification of the 1993 Minerals Agreement. Relators have argued that none of these agreements are valid under federal law. *See* Rels. Mot. Summ. J. 17-23 (Doc. No. 251). Comstock submits that because Relators' claim is derivative from the Government, Relators' allegations of non-compliance with various federal laws and regulations are improper. *See* Defs. Mot. Summ. J. 34 - 43 (Doc. No. 253). Relators reply that they simply have pointed out that the actions taken by employees of the federal government did not comply with the controlling federal statutes and so were not legally effective to revive or ratify the expired state leases. *See* Rels. Mot. Summ. J. 17-23 (Doc. No. 251). Relators allege violations of the Indian Mineral Development Act (the "IMDA"), the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Indian Non-Intercourse Act. *Id.*

In opposing summary judgment on this issue, Relators have a burden to "set out specific facts

showing a genuine issue for trial." Fed. R. Civ. P. 56(e).  Most of the cases relied upon by Relators do not address whether any alleged non-compliance by the Government should invalidate the leases. In *Davis v. Morton*, 469 F.2d 593 (10th Cir. 1972), the court found that a lease of a Native American reservation for development of a small city was covered by NEPA, but rather than hold the leases invalid, the court ordered the trial court to enjoin development pending an environmental evaluation. In *Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983), the court found an oil and gas lease was a "commitment" covered by NEPA, even though the lease required subsequent approval of particular drilling operations, because the lease relinquished authority to prevent all surface disturbing activities. In *Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1988), the court agreed with *Peterson* as to NEPA and reached the same conclusion as to the ESA, holding that "biological opinions assessing the potential impacts of all post-leasing activities" were required before any "further leasing" or "further surface-disturbing activities."  *Id.* at 1458; *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ("following" *Conner*).  The remedy contemplated by these authorities is to enjoin use of the land pending compliance with statutes such as NEPA and the ESA.  Relators do not seek such a remedy here, and such a remedy would actually seem to work against Relators' interest in obtaining proceeds from the oil and gas activities.

As to IMDA, in *Quantum Exploration, Inc. v. Clark*, 780 F.2d 1457 (9th Cir. 1986), the court found that the IMDA permitted a tribe to rescind a joint venture agreement with a mineral developer prior to Government approval.  *Id.* at 1460.  Finally, in *Tonkawa Tribe of Okla. v. Richards*, 75 F.3d 1039 (5th Cir. 1996), the court found the Indian Non-Intercourse Act inapplicable because the 1866 Act to Provide for the Tonkawa Indians, passed by the State of Texas, vested no land interest in the

Tonkawas. *Id.* at 1047. Neither of these authorities support invalidating the Leases at issue in the above-captioned case.

One of Relators' authorities does address lease validity. In *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006), the court discussed *Connor* and found that the lease extensions at issue "must be undone." *Id.* at 788. This ruling by the Ninth Circuit Court of Appeals suggests that a court can invalidate a lease based on a failure to comply with statutes such as NEPA and the ESA. Relators submit no authority from the Fifth Circuit Court of Appeals for this proposition. On balance, Relators have not demonstrated that any purported failures of the Government should operate in favor of the Government in a False Claims Act case, such as here holding the Government's own approved leases invalid and thereby awarding all proceeds of Defendants' activities to the Government as trustee for the Tribe.

To the contrary, there is significant caselaw to support Defendants' contention that the FCA does not allow Relators to question the Government's discretionary decisions. *See, e.g., United States ex rel. Laird v. Lockheed Martin Eng'g & Science Servs. Co.*, 491 F. 3d 254, 262-63 (5th Cir. 2007); *see also United States ex rel. Lamers v. City of Green Bay*, 168 F. 3d 1013, 1020 (7th Cir. 1999) (the FCA was not the "appropriate vehicle" for circumventing a discretionary decision of the Federal Transit Administration). Nor may Relators assert a breach of contract claim on the Government's behalf. *United States v. Southland Mgmt Corp.*, 326 F. 3d 669, 684 (5th Cir. 2003) ("[T]he punitive treble damages and penalties afforded by civil FCA actions are not interchangeable with remedies for ordinary breaches fo contract.").

In summary, the Court has found that the Restoration Act gave the Government leasing authority regardless of title, that all of the Leases were extended, ratified, or revived, and that any purported violations of federal statutes or regulations did not invalidate any of the Leases.


## B.    Guilty Knowledge

"[A] relator . . . cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government." *U.S. ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 232 (5th Cir. 2008).          Defendants move the Court to grant summary judgment to them because "Comstock did not act with the level of intent required to violate the FCA."  Defs. Mot. Summ. J. 41 (Doc. No. 253).  A violation of the False Claims Act requires *scienter*.  "It is a long-established rule of this Circuit that to show a violation of the FCA, the evidence must demonstrate 'guilty knowledge of a purpose on the part of [the defendant] to cheat the Government,' or 'knowledge of guilty intent."  *United States ex rel. Taylor-Vick v. Smith*, 513 F. 3d 228, 231 (5th Cir. 2008) (citations omitted); *see also United States ex. Rel. Anderson v. Northern Telecom, Inc.*, 52 F. 3d 810, 815 (9th Cir. 1995), *cert denied*, 116 S. Ct. 700 (1996) ( "For a *qui tam* action to survive summary judgment, the relators must produce sufficient evidence to support an inference of knowing fraud.").  The FCA defines the terms "knowing" and "knowingly," which mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.  *See* 31 U.S.C.S. § 3729(b).  The Fifth Circuit has explained that "though the FCA is plain that proof of specific intent to defraud is not necessary, the *mens rea* requirement is not met by mere negligence or even gross negligence."  *United States ex rel.*

*Longhi v. Lithium Power Techs., Inc.*, 575 F. 3d 458, 468 (5th Cir. 2009) (internal citations omitted).

Comstock argues that in light of federal ratifications, Comstock could not have had the requisite "guilty knowledge" required by the Fifth Circuit for liability under the False Claims Act.[11] Relators allege that Comstock submitted false claims to the Government because Comstock is charged with knowledge, as a matter of law, with the invalidity of their leases. Relators' allegations of "guilty knowledge" thus depend upon the alleged invalidity of the leases. Upon careful review of the record and evidence before it, the Court finds Relators have failed to offer any evidence that Defendants had the requisite knowledge under the statute. Therefore, even had Relators established that the Leases were invalid, this action could not survive a motion for summary judgment.

## Conclusion & Order

For the foregoing reasons, the Court finds that the Leases are valid. Even if they were invalid, there is no evidence that Defendants had the guilty knowledge required under the FCA. Therefore, the Court shall grant Defendants' motion for complete summary judgment and dismiss this *qui tam* action.

**WHEREFORE, IT IS ORDERED** that the *Defendants' Motion for Complete Summary Judgment* [Clerk's Docket No. 253] is **GRANTED.**

---

[11]"Government knowledge is not a statutory defense to FCA liability but a means by which the defendant can rebut the government's assertion of the knowing presentation of a false claim. Inevitably, the extent of the government's knowledge is also bound up with whether the claim itself was false." *United States v. Southland Mgmt. Corp.*, 326 F. 3d 669, 682 FN 26 (5th Cir. 2003) (citing *Lamers*, 168 F. 3d at 1018).

**IT IS FURTHER ORDER** that all pending motions in this civil action are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Relators' claims are hereby **DISMISSED WITH PREJUDICE**. A final judgment on these claims will be entered separately in accordance with Fed. R. Civ. P. 58.

**IT IS FURTHER ORDERED** that the clerk is **DIRECTED** to close this file.

**SO ORDERED.**

**SIGNED** this the 16 day of **July, 2010.**

Thad Heartfield
United States District Judge